**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

|  |  |  |
|---|---|---|
| ROBERTA WILSON, ANGELA WILSON, AND LISA THORNTON, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | Civil Action No. 3:17-cv-1412 |
| Plaintiffs, | ) | JURY DEMANDED |
| | ) | |
| v. | ) | Hon. Waverly D. Crenshaw, Jr. |
| | ) | Magistrate Judge Barbara Holmes |
| MMR SENIOR ALLIANCE CORP d/b/a RIGHT AT HOME OF MIDDLE TENNESSEE and BHAVANI MUVVALA, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT

---

Plaintiffs Roberta Wilson, Angela Wilson, and Lisa Thornton (the "Plaintiffs") hereby bring this First Amended Collective and Class Action Complaint on behalf of themselves and all others similarly situated under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the laws of the State of Tennessee against MMR Senior Alliance Corp. d/b/a Right at Home of Middle Tennessee ("Right at Home") and its owner, Bhavani Muvvala ("Mr. Muvvala"). As alleged herein, Right at Home and Mr. Muvvala (the "Defendants") have systematically and knowingly violated the rights of their employee Caregivers in multiple respects, giving rise to federal and state law claims.

## NATURE OF THE ACTION

1.     The Plaintiffs bring this action as both a collective action under the FLSA and as a class action, on behalf of themselves and all others similarly situated. As described herein, the

Defendants systemically and knowingly cheated employee Caregivers out of their wages, including failing to pay the promised base wage rate, failing to pay overtime, reducing or deleting hours, refusing to provide promised holiday pay, manipulating wage records, and otherwise intentionally cheating workers out of their pay.

## PARTIES

2.     Plaintiff Roberta Wilson is a resident of Murfreesboro, Tennessee, in Rutherford County.  Ms. Roberta Wilson formerly worked for the Defendants as a Caregiver from January 2016 through July 2017.

3.     Plaintiff Angela Wilson is a resident of Murfreesboro, Tennessee, in Rutherford County.  Ms. Angela Wilson has worked for the Defendants as a Caregiver since November 2015.

4.     Plaintiff Lisa Thornton is a resident of Morrison, Tennessee, in Warren County. Ms. Thornton formerly worked as a Caregiver for the Defendants for approximately four months in 2017.

5.     Defendant MMR Senior Alliance Corporation d/b/a Right at Home of Middle Tennessee is a Tennessee corporation with its principal office at 510 Elk Hollow Court, Franklin, Tennessee 37069-8221.  It is authorized to do business in the State of Tennessee, and can be served through its registered agent, Bhavani Kumar Muvvala, at 510 Elk Hollow Court, Franklin, Tennessee 37069-8221.

6.     Mr. Muvvala is a natural person who resides at 510 Elk Hollow Court, Franklin, Tennessee 37069-8211.  He is a citizen of the State of Tennessee and a resident of Williamson County.  Upon information and belief, he is the sole owner of Right at Home of Middle Tennessee and does business as Right at Home of Middle Tennessee.

## JURISDICTION AND VENUE

7.     The Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331, as provided by 29 U.S.C. § 216(b), and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

8.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b) because Right at Home has its principal place of business in this district, both Right at Home and Mr. Muvvala do business in this district, and a substantial part of the events or omissions giving rise to the claims at issue occurred in this district.

## FACTS

9.     Right at Home is an in-home care provider for senior citizens and others who need in-home daily assistance through employee caregivers ("Caregivers").   The company provides services within the Middle Tennessee area.   Right at Home receives payment for these services from private payers, private insurers, and public payers such as Medicare and Medicaid (including TennCare).

10.     The Plaintiffs and members of the putative class and collective group worked for the Defendants as Caregivers.  Caregivers' job duties include assisting the Defendants' clients as they go about their daily lives, such as helping them dress, clean, prepare meals, transport them to or from doctor's appointments and other outings, and otherwise providing general care and companionship.

11.     At all relevant times, Right at Home and Mr. Muvvala employed the Caregivers and exercised full control over the performance of their job duties.   Defendants assigned the

Caregivers to the locations they worked each day, controlled the shifts Caregivers worked, and represented to clients that the Caregivers were employees.

12.     Upon information and belief, Right at Home, LLC ("Right at Home National") franchises the "Right at Home" brand to local companies that operate under the "Right at Home" brand.  At all relevant times, Right at Home of Middle Tennessee, through its sole owner and operator, Defendant Bhavani Muvvala, has operated as an independently owned and operated franchise of Right at Home National.  (Unless otherwise noted, "Right at Home" shall refer to defendant "MMR Senior Alliance Corporation d/b/a Right at Home of Middle Tennessee").

13.     An individual named Bhavani Muvvala, who refers to himself as "B.K.," has acted as the sole owner and operator of Right at Home at all relevant times.

14.     Right at Home is registered as having a principal office in Franklin, Tennessee. Mr. Muvvala resides at the same address.   However, the company actually operates out of an office at 519 Uptown Square in Murfreesboro, Tennessee.  At all relevant times, Mr. Muvvala employed an office manager at the Uptown Square address.

15.     Upon information and belief, the Defendants are engaged in business operations affecting interstate commerce.  Upon information and belief, the Defendants received payments for services through credit card transactions across state lines, through Medicare and Medicaid payments across state lines, interacted with insurance payers across state lines, and purchased and furnished to Caregivers goods or materials that had moved in interstate commerce such as gloves and garments.  Upon information and belief, the Defendants also utilized and continue to utilize an online portal called "ClearCare Online," which is provided by a California-based company, to track Caregiver hours worked for the Defendants and to handle scheduling. Furthermore, the Defendants operate pursuant to a franchise agreement with Right at Home

National, which is a Nebraska corporate entity that operates both domestically and internationally, and that licenses the "Right at Home" brand to the Defendants across state lines and has contracted with the Defendants across state lines to operate and do business.

16.     Upon information and belief, the Defendants employed at least 30-40 Caregivers at any point during the relevant time frame.

## ROBERTA WILSON

17.     Roberta Wilson ("Ms. Wilson") worked for the Defendants from January 2016 to July 2017.  At the outset of her employment, in a January 25, 2016 letter, the Defendants promised Ms. Wilson a wage rate of $10/hour.  *See* **Exhibit A** hereto.  Ms. Wilson also signed an agreement when she began employment reflecting a promised wage rate of at least $10/hour, although that document was no longer in her employment file when she asked for it in July 2017. The Defendants further promised to pay Ms. Wilson overtime pay for all hours worked in excess of 40 hours per work week.

18.     At the outset of her employment, Ms. Wilson signed an employee handbook containing the Defendants' policies and procedures.  *See* **Exhibit B** hereto.  Upon information and belief, all Caregivers employed by the Defendants during the last three years received and were subject to the same or substantially identical policies and operated under the same terms and conditions of employment.  The Handbook promised that all non-exempt Caregivers would receive overtime pay for hours worked "in excess of 40 hours in any one workweek[.]"

19.     During the course of Ms. Wilson's employment, Ms. Wilson consistently worked over 40 hours per week.  In those weeks, she should have received $10/hour straight time pay and $15/hour for overtime pay.

20.     However, the Defendants consistently cheated Ms. Wilson out of both overtime pay and straight-time pay in at least following respects:

    a.  Without any notice or justification, Defendants often paid Ms. Wilson only $9 per hour straight time and $13.50 overtime; and

    b.  The Defendants also at times failed to pay Ms. Wilson when she worked on holidays, even though the Defendants had promised to pay her (and were legally obligated to pay her) for that work.

21.     In the summer of 2017, the Defendants told Ms. Wilson that they did not have sufficient work for her to perform as a Caregiver, effectively terminating her.

## LISA THORNTON

22.     Lisa Thornton ("Ms. Thornton") worked as a caregiver for the Defendants for approximately three months in 2017.

23.     During her tenure, Ms. Thornton often worked over 40 hours in a given work week.  As with the other Caregivers, Ms. Thornton was supposed to receive $10 per hour as a base wage rate and $15 per hour for overtime pay.  Ms. Thornton did not receive appropriate compensation during the course of her employment, both as to straight time and overtime pay.

24.     Ms. Thornton used a remote application to log her hours, which would have reflected the actual hours that she worked.  However, Ms. Thornton observed that Mr. Muvvala was manipulating the log to reflect not only her assigned shift, but was also reducing or deleting any time before or after her shift that she actually worked.

25.     In certain biweekly pay periods, Ms. Thornton worked over forty hours in one of the two weeks but fewer than 40 hours in the other. Ms. Thornton observed that paychecks for these weeks often reflected only straight time pay for overtime hours.  This occurred because Mr. Muvvala was taking time worked over hours in one week, adding those hours to the week that

Ms. Thornton worked under 40 hours, and treating the transferred hours as straight time hours. Ms. Thornton kept a log of her own hours to show her actual hours worked.

26. Collective **Exhibit C** hereto contains an example of this issue. Ms. Thornton kept "Care Notes" reflecting her hours worked (which she also logged through the electronic system). In a particular pay period in May 2017, she worked 64 hours in one week (*i.e.*, 40 hours of straight time plus 24 overtime hours) and 23 hours the second week. Ms. Thornton should have received 24 hours of overtime pay. Instead, Mr. Muvvala paid her only 7 hours of overtime pay. He tallied up the total hours worked across both weeks – 87 hours – and treated Ms. Thornton as having worked 40 straight time hours in each week. In other words, he carried over 17 overtime hours and treated them as straight time hours.

27. Ms. Thornton complained about her paychecks to Mr. Muvvala multiple times. Mr. Muvvala indicated that he was intentionally paying Ms. Thornton only straight-time pay for overtime hours intentionally, and that the company had a policy of carrying over hours from an overtime week to a non-overtime week for that purpose. Mr. Muvvala also stated that he intentionally and arbitrarily had reduced Ms. Thornton's wage rates to $9 straight time and $13.50 overtime in order to avoid paying her full wages.

28. As a result of Mr. Muvvala's unfair pay practices, Ms. Thornton finally quit working for the Defendants.

## ANGELA WILSON

29. Angela Wilson ("Angela") has been victimized by much of the same misconduct by the Defendants.

30. At the outset of her employment, the Defendants promised to pay Angela $10 per hour initially and to raise her pay thereafter.

31.     Not only did the Defendants not give her the promised raise, the Defendants often changed her base rate to $9 per hour (and correspondingly the overtime rate to $13.50 per hour) without explanation.  Angela should have received at least $10 per hour base and $15 overtime pay, and those rates should have increased during her tenure but did not.

32.     Angela has regularly worked overtime during her tenure, often totaling over 150 hours of work in a biweekly pay period.  As with other Caregivers, the Defendants consistently failed to pay Angela her overtime pay and, in certain weeks, may have carried over hours to avoid paying sufficient overtime.

33.     Early in her tenure, Angela logged her hours remotely and, as with other Caregivers, observed that the Defendants consistently manipulated the log to conform to her assigned shift rather than actual hours logged and work.  After months of experiencing this issue, Angela finally gave up logging her actual hours and simply logged in and out on her assigned shift.

34.     As with the other Caregivers, the Defendants did not pay Angela for working during certain holidays.

35.     Angela confronted the Defendants about these practices.  Mr. Muvvala told her that the company could not afford to pay overtime at the promised rates.  He also told her that he was entitled to change her pay from week-to-week at his discretion.  Furthermore, Mr. Muvvala told her that could not afford to pay her for holidays worked and therefore refused to compensate her.

36.     In 2017, in an effort to avoid paying her overtime, the Defendants suddenly started paying Angela only a fixed amount every two weeks regardless of how many hours she worked.  Although Angela continued to act purely as a Caregiver – as she had all along – the

Defendants attempted to characterize her as an "office" worker. This was a sham. Without explanation, the Defendants ceased identifying Angela's wage rates and hours worked on her pay stubs.

37.     Angela confronted the Defendants about this practice. Mr. Muvvala responded by stating that the company could not afford to pay her overtime and that, as a consequence, he was entitled to limit her pay to a fixed amount regardless of hours worked.

38.     On October 27, 2017, Angela, Ms. Wilson, and Ms. Thornton filed the original Complaint in this case, asserting claims under the FLSA and under state law.

39.     On November 1, 2017, Angela received a request from Mr. Muvvala to meet in his office. At that meeting, Mr. Muvvala indicated that he had just been served with the Complaint, and he began to talk to Angela about the lawsuit.

40.     During the meeting, he asked Angela to remove her name from the Complaint. He told that Angela that he had a reputation to protect. He challenged the allegations, stating that he had only assigned Angela overtime hours because Angela had agreed to accept straight-time pay for all hours worked. That statement was categorically false.

41.     Mr. Muvvala also suggested that if Angela maintained the lawsuit, the Defendants might be forced to go out of business, which Angela reasonably construed as an effort to "guilt trip" her into dropping her claims. Mr. Muvvala also stated that he could not fire Angela because clients request her a lot. Angela told Mr. Muvvala to contact undersigned counsel if he wanted to discuss the Complaint.

42.     Shortly after November 1, 2017. Mr. Muvvala began cutting Angela Wilson's hours dramatically.

43.     Prior to the initiation of this lawsuit, Angela had been working approximately 150 to 180 hours per biweekly pay period, including multiple shifts for multiple clients every day of the week.  *See* **Exhibit D** hereto, Angela Wilson Schedule as of October 31, 2017.

44.     Angela had good relationships with each of the Defendants' clients for whom she provided care, each of whom she had served for nearly a year or more.

45.     Nevertheless, within days of learning of this lawsuit, the Defendants took away certain Tuesday and Thursday shifts from Angela for a particular client.  That client was happy with Angela's care and had not requested a change of caregivers.  Upon information and belief, that client's family asked for Angela to be reinstated as that client's caregiver, but the Defendants still refused to reinstate Angela to those shifts.

46.     After this lawsuit was filed, the Defendants also asked Angela to begin training a replacement caregiver to take Angela's place on morning shifts with respect to another client.  That client also was happy with Angela's work and had not requested a change of caregivers.

47.     Angela is a single mother of three children, ages 18, 12, and 4.  The Defendants are aware that Angela is a single mother and that she pays for day care for her four-year old child.  Upon information and belief, the Defendants knew that taking away shifts from Angela would make it difficult if not impossible for Angela to provide for her family's welfare.  Upon information and belief, the Defendants knowingly took shifts away from Angela to punish her for participating in this lawsuit or otherwise to discourage her and putative opt-in plaintiffs from pursuing meritorious wage and hour claims against them.

48.     Furthermore, after the lawsuit was filed, Right at Home began badgering the clients that Angela serves, asking them repeatedly about whether Angela was on time in arriving at or leaving her shift, and whether Angela was performing her job satisfactorily.  This badgering

has reached the point that the clients are becoming frustrated at Right at Home for these unnecessary inquiries. Upon information and belief, the Defendants made these inquiries in an effort to retaliate against Angela for participating in this lawsuit, and as part of an effort to find an excuse to take additional adverse actions against her.

## ADDITIONAL FACTS

49.    At all relevant times, Mr. Muvvala:

    a.  has acted as the sole owner of Right at Home of Middle Tennessee;

    b.  has transacted business as "Right at Home of Middle Tennessee";

    c.  has exercised operational control over the company's business practices in all respects, including but not limited to: setting the terms and conditions of employment, hiring and firing, and payroll;

    d.  has exercised full and exclusive control over the company's payroll practices, including but not limited to: setting the wage rates, classifying employees, paying wages or salaries, determining the hours of work to be paid for straight time and overtime, and the compensation of holiday work;

    e.  had access to and, in fact, did manipulate the hours logged by Caregivers; and

    f.  acted as an employer of the Caregivers.

50.    Furthermore, at all relevant times:

    a.  "Right at Home's" principal office (per its Tennessee registration) is located at Mr. Muvvala's personal residence;

    b.  Upon information and belief,  Mr. Muvvala mixed funds paid to "Right at Home" with personal accounts; and

    c.  Mr. Muvvala exercised full operational control of Right at Home.

For these reasons, Mr. Muvvala acted as the *alter ego* of Right at Home.

51.    Upon information and belief, Defendants failed to post, and keep posted in the main office, any notice of employees' wage and hour rights as required by federal and state law.

52.     The Caregivers were supposed to earn at least $10/hour as a base wage, but the Defendants frequently and systematically underpaid Caregivers for both straight time wages and overtime wages.  The Defendants specifically intended not to pay sufficient overtime wages to all Caregivers who worked more than 40 hours per week.  Mr. Muvvala was the sole decisionmaker in this regard.  He alone, exercising full and exclusive operational control over the company's business operations and payroll processes, systematically and knowingly underpaid all Caregivers who worked overtime in one or more the following ways:

   a.  Arbitrarily and retroactively changing wage rates from $10 straight time/$15 overtime to $9 straight time/$13.50 overtime in particular weeks, solely for the purpose of underpaying Caregivers and denying them full overtime pay;

   b.  Reducing or deleting Caregiver hours for payroll purposes only, solely for the purpose of paying Caregivers for fewer overtime hours than they actually worked;

   c.  Refusing to compensate time worked on a holiday; and

   d.  Carrying over overtime hours into weeks in which a Caregiver worked less than 40 hours, solely for the purpose of denying Caregivers overtime pay for hours worked over 40 in a given workweek.

53.     In substantially the same manner, Mr. Muvvala and Right at Home intentionally cheated Caregivers out of their promised base pay as well.

54.     Despite being confronted by the Plaintiffs and others multiple times over the past two years, the Defendants have never even disputed that they knowingly underpaid workers or engaged in the referenced misconduct.  Instead, Mr. Muvvala offered a variety of meritless excuses, such as stating there was no way to rectify the issue, that he was entitled to alter wages retroactively to limit the total amount paid out, that he had discretion to carry over overtime, or that he simply could not afford to pay Caregivers the overtime wages that they were owed. Furthermore, immediately receiving a copy of the Complaint, Mr. Muvvala confronted Angela

and falsely claimed that he was not required to pay Angela straight time because she had agreed to accept straight-time pay for overtime hours.

55.     As reflected in the aforementioned allegations, Mr. Muvvala has therefore engaged in a common scheme to cheat Caregivers out of owed pay, including overtime pay.

56.     The Defendants' conduct was egregious, deplorable, and willful.

## COLLECTIVE ACTION ALLEGATIONS

57.     All of the foregoing paragraphs are incorporated herein.

58.     At all relevant times, the Plaintiffs were employed by the Defendants as Caregivers.  The Plaintiffs bring their FLSA claims as an opt-in collective action on behalf of themselves and all other similarly situated employees under 29 U.S.C. § 216(b).

59.     The Plaintiffs bring their FLSA claims on behalf of all hourly workers employed by Defendants as Caregivers in the Middle Tennessee area, who worked more than forty (40) hours in a given work-week at any time within the last three years (the "Collective Group").

60.     The Defendants failed to pay all members the Collective Group overtime pay of one and one-half times their regular hourly rate for all hours worked in excess of forty (40) per week during the relevant time period.  The Defendants did so intentionally to avoid paying overtime wages owed.  At times, Mr. Muvvala even admitted that this was his intention, claiming that he had lawful authority to pay whatever rates he wanted at any given point in time, and that he was underpaying workers simply because his company "could not afford" to pay overtime.  This was a common scheme from a single source: Mr. Muvvala.

61.     Mr. Muvvala carried out this single scheme to cheat workers out of overtime in one or more of the following ways as to each Caregiver: (a) intentionally shaving overtime hours logged and actually worked by Caregivers, (b) paying Caregivers at an "overtime" rate that was

less than one and one-half times their promised base rate of pay, (c) carrying over overtime hours from one week to another to avoid paying overtime on those hours, and (d) not paying overtime wages for overtime hours worked on holidays.

62.     Mr. Muvvala failed to post (and maintain) in an appropriate location any notice of employees' wage and hour rights as required by the FLSA and accompanying regulations.

63.     The Plaintiffs and members of the Collective Group do not qualify as exempt employees, as defined by the FLSA or applicable Federal regulations.

64.     The Plaintiffs and members of the Collective Group are similarly situated, perform substantially similar labor for the Defendants, receive pay from the same source, and are subject to the Defendants' common employment practices and policies.

65.     The Defendants' liability under the FLSA for failing to compensate the Plaintiffs and the Collective Group properly is uniform across the Collective Group.

66.     The Defendants have willfully and intentionally engaged in a widespread, continuous pattern and practice of violating the FLSA, as detailed herein, by failing to properly compensate Plaintiffs and the Collective Group.

67.     As a result of the willfulness of the Defendants' FLSA violations, a three-year statute of limitations from the filing of the original Complaint applies to such violations, under 29 U.S.C. § 255.

68.     As a result of the Defendants' unlawful acts, the Plaintiffs and the Collective Group have been deprived of regular rate compensation and overtime compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation under 29 U.S.C. § 216.

69. For these reasons, the Plaintiffs seek to certify the Collective Group under 29 U.S.C. § 216.

## CLASS ACTION ALLEGATIONS

70. The Plaintiffs bring Tennessee state law claims on behalf of themselves and all present and former hourly workers employed as Caregivers by Defendants who were paid $9 per hour as a base wage rate at any point in time from January 1, 2011 through the present (the "Class Period") (collectively, the "Class"). The Plaintiffs seek all appropriate relief on behalf of the Class as to both straight-time and overtime pay.

71. The number and identity of the Class members are readily ascertainable from the Defendants' business records and/or the testimony of Defendants' employees. Notice can be provided by means reasonable under Fed. R. Civ. P. 23.

72. The factors set forth class certification under Rule 23(a) are established:

   a. Numerosity: Upon information and belief, the Defendants employed approximately 30-40 Caregivers at any point in time, with relative turnover during the Class Period. The proposed class therefore is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court;

   b. Commonality: There are numerous questions of law and fact common to the Class as a whole, including but not limited to the following:

      i. Whether the Defendants are employers of the Class members;
      ii. Whether the Defendants routinely shaved hours worked by Class members;
      iii. Whether work performed before or after a Class members' assigned shift conferred a benefit upon the Defendants;
      iv. Whether the Defendants were aware of the benefits they received from uncompensated work performed by Caregivers; and
      v. Whether the Defendants promised Class members $10 per hour as a base rate of pay.

c. <u>Adequacy</u>: The Plaintiffs are able to, and will fairly and adequately, protect the interests of the Class, and they have no interests antagonistic to the Class. They have been victimized by the Defendants' scheme to deny them sufficient straight-time pay. The Plaintiffs are also represented by attorneys who are experienced in and competent in both class action litigation and employment litigation, and have previously represented plaintiffs in wage and hour and related case; and

d. <u>Typicality</u>: The Plaintiffs' claims are typical of the claims of Class members, who have not been fully compensated for hours worked.

73.     The Rule 23(b)(3) factors are met. The common issues in the case predominate over any individualized issues. Furthermore, a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual Class members are working-class persons who lack the financial resources to prosecute a lawsuit vigorously as individuals. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expenses of numerous individual actions. The adjudication of individual litigation claims would result in a great expenditure of court and public resources. Treating the claims as a class action would result in a significant savings of these costs. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent and/or varying adjudications, establishing incompatible standards of conduct for the Plaintiffs and result in the impairment of Class members' rights. Rather, because all the issues before the Court are common and could be fairly determined in a class action context, the class action is superior to any of the other available methods of adjudication. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action, including sub classing.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
### (29 U.S.C. §§ 206, 207)
### Asserted by All Plaintiffs

74.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

75.     Upon information and belief, Defendants collectively operate a single business venture, Right at Home.  Alternatively, they are joint employers.

76.     Defendants are employers, as defined by 29 U.S.C. § 203, and are otherwise covered by and subject to the provisions of the FLSA.

77.     At all relevant times, Defendants have employed more than two employees and have had an annual volume of sales or business of at least $500,000.

78.     At all relevant times, the Plaintiffs and other Caregivers are or were employed by the Defendants who acted as an enterprise engaged in interstate commerce.

79.     Plaintiffs, at all times relevant, were Defendants' employees as defined by 29 U.S.C. § 203, and are otherwise covered by the FLSA.  Plaintiffs are not exempt from coverage of any section of the FLSA.

80.     At all times relevant, Defendants were required to pay Plaintiffs "a rate not less than one and one-half times the regular rate at which [they were] employed," for all hours worked in excess of forty (40) per work week, pursuant to Section 7 of the FLSA.

81.     Defendants have failed to pay Plaintiffs one and one-half times their regular wage for hours worked in excess of forty (40) per work week.

82.     Defendants have violated the FLSA by failing to comply with federal overtime requirements.

83.     Defendants have failed to post, and keep posted in an appropriate location, any notice of employees' wage and hour rights as required by the FLSA and accompanying regulations.

84.     As a result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer harm, including but not limited to lost wages and other financial loss.

85.     Plaintiffs are entitled to all remedies available for violation of the FLSA, including, but not limited to, those damages provided in 29 U.S.C. § 216(b).

## COUNT II:
## UNJUST ENRICHMENT/QUANTUM MERUIT
### Asserted By All Plaintiffs

86.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein. Plaintiffs bring this claim on behalf of themselves and the Class, as previously defined.

87.     Plaintiffs and the Class members conferred a benefit on the Defendants by performing work for clients of the Defendants as Caregivers without receiving full straight-time and overtime compensation.

88.     As business owners, Defendants appreciated the value of the benefits conferred upon them by the Plaintiffs and accepted those benefits by allowing the Plaintiffs to work those hours and, upon information and belief, receiving compensation from insurers or public and private payers for those hours worked.

89.     Had the Plaintiffs not performed this work, the Defendants would have had to pay someone else to perform that work.

90.     Furthermore, the Defendants falsely promised the Caregivers a particular wage rate to induce them to join the company as employees and to continue working as Caregivers while in the company's employ.  The Defendants also falsely promised to pay overtime for hours worked over forty (40) within a given workweek.

91.     The Caregivers are a vulnerable population of working class people for whom even a modest change in wages has a serious impact.

92.     Under the circumstances, it would be unjust and inequitable for the Defendants to be allowed to retain the benefit of Plaintiffs' labor and other benefits conferred without proper compensation.

## COUNT III
## BREACH OF CONTRACT
### Asserted by All Plaintiffs

93.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

94.     Plaintiffs bring this claim on behalf of themselves and the Class, as previously defined.

95.     Defendants offered to hire Plaintiffs and to pay them a certain base wage rate and overtime pay (relative to the promised base wage rate) for hours worked over forty per week. Plaintiffs accepted that offer.

96.     The parties therefore formed a valid and enforceable contract.

97.     Defendants breached that agreement by failing to pay Plaintiffs full and accurate compensation for both straight-time hours and overtime hours worked.

98.     As a result of the breach of contract, Plaintiffs suffered damages in the form of lost wages.

## COUNT IV
## PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE
### Asserted by All Plaintiffs

99.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

100.     Plaintiffs bring this claim on behalf of themselves and the Class, as previously defined.

101.     Defendants offered to hire Plaintiffs and to pay them a certain base wage rate and overtime pay (relative to the promised base wage rate) for hours worked over forty per week.

102.     Defendants' promises were unambiguous.

103.     In reliance on the Defendants' promises, the Plaintiffs performed work for the Defendants expecting to receive straight-time pay at the promised rate and overtime pay at the promised rate.  The Defendants' promises induced the Plaintiffs to perform work for the Defendants that the Plaintiffs would not have performed, but for the Defendants' promises.

104.     The Plaintiffs relied upon the Defendants' promises to their detriment, ultimately receiving a lower wage rate (both as to straight-time and overtime) than they had been promised for the work that they performed.

105.     As a result of the Defendants' conduct, the Plaintiffs suffered damages in the form of lost wages.

## Count V
## RETALIATION IN VIOLATION OF FAIR LABOR STANDARDS ACT (29 U.S.C. § 215)
### Asserted by Plaintiff Angela Wilson

106.     Angela Wilson incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

107.    Angela engaged in protected activity by filing this lawsuit, which asserts her right to overtime pay under the FLSA.

108.     As set forth above, upon learning of this lawsuit, the Defendants retaliated against Angela for filing the Complaint in multiple respects, including asking her to take her name off the Complaint, threatening to cut her hours, pressuring her to accept straight-time pay for overtime hours going forward, dramatically cutting her hours (*i.e.*, following through on the threat) by removing shifts and having her train a replacement for another multiple shifts as to another client, and unnecessarily badgering the clients about her job performance and timeliness.

109.    The Defendants took these adverse actions to retaliate against Angela for filing this Complaint and to discourage her and other opt-in Plaintiffs from pursuing FLSA claims.

110.    Under 29 U.S.C. § 215(a)(3), the FLSA's anti-retaliation provision, it is unlawful for an employer "to discharge or in any other manner to discriminate against any employee because such employee has filed or instituted or caused to be instituted any proceeding under or related to this chapter . . . ."

111.    The Defendants actions against Angela constitute violations of the FLSA anti-retaliation provision.

112.    As a result of the Defendants' retaliatory actions, Angela has suffered both economic and non-economic damages.

113.    The Defendants are aware that the cut in hours threatens Angela's livelihood, including her ability to pay rent and to cover everyday living expenses.   The Defendants are also aware that, like Roberta Wilson, Angela may not be able to find other work if she is not restored to the *status quo ante*.  The Defendants are also hoping to damage Angela's relationship with the

clients she currently serves, so that those clients will not seek to hire Angela privately or through another company if she leaves the Defendants' employ.

114.    By retaliating against Angela in this fashion, the Defendants intention is to dissuade Angela and others from participating in this lawsuit and from exercising their rights under the FLSA.

115.    Angela is therefore entitled all anti-retaliation remedies available under the FLSA, including but not limited to damages, preliminary injunctive relief, permanent injunctive relief, and any other appropriate equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

1.    Certification of this matter as a collective action and designation of the Plaintiffs as representatives of the Collective Group for the FLSA claims, and an order to issue notice thereof;

2.    Certification of the Class under Rule 23, appointment of the Plaintiffs as Class representatives, and appointment of undersigned counsel as Lead Class Counsel, and an order to issue notice thereof;

3.    Injunctive relief and other equitable to remedy and to prevent further retaliation by the Defendants against Angela Wilson, including but not limited to a preliminary injunction and a permanent injunction restoring Angela to her schedule as of the date of filing this action, barring the Defendants from addressing the Complaint with Angela directly, and ordering the Defendants to cease any and all acts of retaliation against Angela;

4.    Injunctive and other equitable relief to remedy to or to prevent retaliation against members of the putative Class or the putative Collective Group, including but not limited to providing preliminary notice of this lawsuit and notice of rights against retaliation to all current employee Caregivers of the Defendants, and issuing a preliminary injunction barring the Defendants from discussing this substance of this lawsuit with current Caregivers;

5.    A judgment in favor of the Plaintiffs and the Collective Group of all damages allowable by law under the FLSA and interpretative regulations, including but not limited to: unpaid wages, liquidated damages, and/or statutory damages;

6.    A judgment in favor of the Plaintiffs and the Class in the amount of all damages allowable under Tennessee law, including but not limited to: unpaid wages, disgorgement of profits earned, reimbursement of amounts improperly deducted, compensatory damages, other damages allowed under state law;

7.    An award of pre- and post-judgment interest as allowed by law;

8.    An award of Plaintiffs' costs and expenses of litigation, including but not limited to: attorneys' fees, costs and expenses;

9.    An award of further equitable or legal remedies that the Court deems appropriate; and

10.    A trial by jury.

Dated:     November 27, 2017          Respectfully submitted,


                                      /s/ *J. Gerard Stranch, IV*
                                      J. Gerard Stranch, IV (BPR# 23045)
                                      Joe P. Leniski (BPR# 22891)
                                      Anthony A. Orlandi (BPR# 33988)
                                      Callie Jennings (BPR# 35198)
                                      Branstetter, Stranch & Jennings, PLLC
                                      The Freedom Center
                                      223 Rosa L Parks Ave, Suite 200
                                      Nashville, Tennessee 37203
                                      (615) 254-8801
                                      gerards@bsjfirm.com
                                      joeyl@bjsfirm.com
                                      aorlandi@bjsfirm.com
                                      calliej@bjsfirm.com

                                      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 27, 2017, the foregoing document was served via the Court's electronic filing system upon all counsel of record, including the following:

W. Bryan Brooks
Brewer, Krause, Brooks & Chastain, PLLC
545 Mainstream Drive
Suite 101
Nashville, TN 37228
(615) 256-8787
Email: bbrooks@bkblaw.com

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV